Leonard T. Strand, Chief Judge *1121 I. INTRODUCTION
This matter is before me on the Government's motion (Doc. No. 27) to revoke a release order (Doc. Nos. 14, 17) by the Honorable Kelly K.E. Mahoney, United States Magistrate Judge. Defendant Walter Villatoro-Ventura has filed a resistance (Doc. No. 38). Also before me is Villatoro-Ventura's first motion (Doc. No. 29) to dismiss the indictment (Doc. No. 1) with prejudice.[1] The Government has resisted (Doc. No. 43) and Villatoro-Ventura has replied (Doc. No. 50). I held a hearing on August 27, 2018, during which additional evidence was presented. Both motions are ready for decision.
II. BACKGROUND FACTS AND PROCEEDINGS
On June 5, 2018, Villatoro-Ventura was arrested by Immigration and Customs Enforcement (ICE). ICE held Villatoro-Ventura in custody until a grand jury returned an indictment on June 19, 2018, charging him with one count of being found after illegal reentry in violation of 8 U.S.C. § 1326(a). While Villatoro-Ventura was in ICE custody, he was not brought before an immigration judge (IJ) or hearing officer or offered a bond hearing.[2] In fact, there is no evidence that any immigration proceedings happened during the time Villatoro-Ventura was held in ICE custody prior to his transfer to the custody of the United States Marshal.
On June 26, 2018, Villatoro-Ventura was transferred to Marshal custody for his initial appearance and arraignment in this case. The process by which Villatoro-Ventura found himself transferred from ICE to Marshal custody for federal prosecution *1122 is regulated by a mixture of ICE and United States Attorney's Office (USAO) policies.[3] Up to the point of transfer, other than perhaps the 21 days of inaction by ICE, there is little controversial about the proceedings against Villatoro-Ventura.
Villatoro-Ventura's case became complicated at his initial appearance and arraignment on June 26, 2018. At that time, he exercised his right under 18 U.S.C. § 3142 (the Bail Reform Act or BRA), to request a detention hearing. Doc. No. 6. Judge Mahoney held a detention hearing on June 29, 2018, during which she considered the Pretrial Services Report (PSR) prepared by United States Probation, the testimony of ICE Deportation Officer Christopher Green and Villatoro-Ventura's proffer of information. Doc. No. 13. Judge Mahoney ordered Villatoro-Ventura released. The Government, through Officer Green and Assistant United States Attorney Kevin Fletcher, represented that release under the BRA would result in ICE taking Villatoro-Ventura into custody[4] and deporting him before his trial date. However, Judge Mahoney held that such alleged eventuality should not affect the court's determination under the BRA:
In this case, ICE very clearly decided that criminal prosecution should take precedence over removal proceedings; Villatoro-Ventura was in ICE custody for 21 days (from June 5 to June 26) without being removed before ICE turned him over to appear in the criminal case. The Government acknowledged at the detention hearing that if Villatoro-Ventura is removed from the United States by ICE prior to trial in this case, the criminal indictment would have to be dismissed. Therefore, it appears the Government is fully aware of the risk to the criminal case should ICE detain and deport Villatoro-Ventura pending trial. The conflict between either Villatoro-Ventura being released on conditions and standing trial or being taken into immigration custody and removed prior to trial rests with the [USAO] and ICE, both agencies within the Executive Branch. It is not the court's place to resolve internal decisions between the Department of Justice and the Department of Homeland Security about *1123 whether a criminal prosecution or administrative deportation should take precedence in this case.
Doc. No. 17 at 15. Put another way, Judge Mahoney held that the various agencies of the Executive Branch could not use their alleged failure to cooperate on Villatoro-Ventura's case to deprive him of his rights. Judge Mahoney also stated that the risk of Villatoro-Ventura's deportation was on the Government: "It is now up to the Government (both the [USAO] and ICE) to determine whether it is more important to prosecute Villatoro-Ventura for illegal reentry (after which they can resume removal proceedings), or expeditiously remove him from the country and risk dismissal of the indictment." Id. at 15-16.
Judge Mahoney stayed her release order for seven days to allow the Government to appeal. However, the Government requested an extension of time to appeal (Doc. No. 20) and Villatoro-Ventura was ultimately released from Marshal custody. Villatoro-Ventura was then taken back into ICE custody and the court was advised that his deportation was scheduled for a date certain some two weeks after he was returned to ICE custody. In addition, Villatoro-Ventura filed his first motion to dismiss the indictment, arguing that ICE and the USAO could not pursue the dual track of deportation and prosecution without violating his statutory and constitutional rights. In order to ensure that Villatoro-Ventura was not deported pending resolution of the Government's appeal, and of Villatoro-Ventura's motion to dismiss, I granted a writ of habeas corpus ad prosequendum to bring Villatoro-Ventura back into Marshal custody. Doc. Nos. 30 to 32.
III. REVIEW OF RELEASE ORDERS
A United States Magistrate Judge may issue orders "pursuant to Section 3142 of Title 18 concerning release or detention of persons pending trial ...." 28 U.S.C. § 636(a)(2). If the magistrate judge orders pretrial release, the Government may file a motion to revoke that order pursuant to 18 U.S.C. § 3145(a)(1). A district judge reviewing a magistrate judge's pretrial order of release or detention must conduct a de novo review of that order. See United States v. Maull , 773 F.2d 1479, 1481 (8th Cir. 1985) (en banc).
IV. APPLICABLE LAW
A. The Bail Reform Act
The Bail Reform Act of 1984 guides the federal court's determination of a defendant's pretrial release and bail rights. The BRA was enacted in "response to numerous perceived deficiencies in the federal bail process." United States v. Salerno , 481 U.S. 739, 742, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). "By providing for sweeping changes in both the way federal courts consider bail applications and the circumstances under which bail is granted, Congress hoped 'to give the courts adequate authority to make release decisions that give appropriate recognition to the danger a person may pose to others if released." Id. , (citing S. Rep. No. 98-225, at 3, U.S. Code Cong. & Admin. News 1984, p. 3185). In assessing whether a defendant should be released, 18 U.S.C. § 3142(a) establishes four options: (1) release on personal recognizance or upon execution of an unsecured appearance bond under § 3142(b) ; (2) release on one or more conditions outlined in § 3142(c) ; (3) temporary detention to permit revocation of conditional release, deportation, or exclusion under § 3142(d) ; or (4) detention pursuant to § 3142(e). The court may order detention of an arrestee pending trial only if the Government demonstrates after an adversarial hearing that no release conditions "will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).
*1124 The BRA applies to all persons charged with a federal crime, regardless of immigration status. The only provision of the BRA that differentiates between the treatment of aliens and citizens - § 3142(d) - permits only a "temporary detention to permit ... deportation, or exclusion" if the judicial officer determines that the defendant "is not a citizen of the United States or lawfully admitted for permanent residence" and "may flee or pose a danger to any other person or the community." Id. at § 3142(d) (1)(B), (d)(2). In such a case, the BRA states: "If the official fails or declines to take such person into custody during that period, such person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings." Id. at § 3142(d). In this case, ICE brought Villatoro-Ventura to the attention of the USAO, not the other way around. Thus, the temporary detention provisions of § 3142(d) do not apply. Instead, Villatoro-Ventura's pretrial release must be resolved pursuant to § 3142(e).
"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." Salerno , 481 U.S. at 756, 107 S.Ct. 2095 ; United States v. Orta , 760 F.2d 887, 891-92 (8th Cir. 1985) (en banc) ("Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial."); see also U.S. Const. Amend. V & VIII. A request to detain a defendant pending trial under § 3142(e) triggers a two-step inquiry. United States v. Delgado , 985 F.Supp.2d 895, 897 (N.D. Iowa 2013). The court must first consider whether the Government has shown, by a preponderance of the evidence, that it is authorized to seek detention under § 3142(f)(1) or (2). Orta , 760 F.2d at 891 n.20 ("The statute does not expressly state the appropriate evidentiary standard necessary to support a finding of propensity for flight, indicating the preponderance of the evidence standard usually applied in pretrial proceedings is appropriate."). Section 3142(f)(1) provides that the Government may move for detention
[I]n a case that involves-
(A) a crime of violence, a violation of section 1591, or an offense listed in section 1591, or an offense listed in section 2332b(g)(5)(B) for which a maximum term of imprisonment of 10 years or more is prescribed;
(B) an offense for which the maximum sentence is life imprisonment or death;
(C) an offense for which a maximum term of imprisonment of ten years or more is prescribed in the Controlled Substances Act ( 21 U.S.C. 801 et seq. ), the Controlled Substances Import and Export Act ( 21 U.S.C. 951 et seq. ), or chapter 705 of title 46;
(D) any felony if such person has been convicted of two or more offenses described in subparagraphs (A) through (C) of this paragraph, or two or more State or local offenses that would have been offenses described in subparagraphs (A) through (C) of this paragraph if a circumstance giving rise to Federal jurisdiction had existed, or a combination of such offenses; or
(E) any felony that is not otherwise a crime of violence that involves a minor victim or that involves the possession or use of a firearm or destructive device (as those terms are defined in section 921), or any other dangerous weapon, or involves a failure to register under section 2250 of title 18, United States Code [.]
18 U.S.C. § 3142(f)(1). Additionally, § 3142(f)(2) provides that upon motion of *1125 the Government or on its own initiative, the court may consider detention
[I]n a case that involves-
(A) a serious risk that such person will flee; or
(B) a serious risk that such person will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror.
Id. at § 3142(f)(2). This case involves § 3142(f)(2)(A). The Government does not allege that Villatoro-Ventura committed one of the crimes enumerated in § 3142(f)(1) or that he will attempt to obstruct justice under § 3142(f)(2)(B). Therefore, in order to seek detention, the Government must establish by a preponderance of the evidence that there is a serious risk that Villatoro-Ventura will flee.
If the Government meets that threshold burden, the court must move to the second step and determine whether any condition or combination of conditions will reasonably assure the defendant's appearance as required. Id. at § 3142(e). In this context, "reasonably assure" does not mean guarantee.[5] Orta , 760 F.2d at 892 ("[T]he district court erred in interpreting the 'reasonably assure' standard set forth in the statute as a requirement that release conditions 'guarantee' ... the defendant's appearance. Such an interpretation contradicts both the framework and the intent of the pretrial release and detention provision of the [BRA]."). In determining whether there are conditions of release that will reasonably assure the appearance of the defendant, the court must apply the factors outlined in § 3142(g), which are: (1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a firearm; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release. The court must then determine whether any of the conditions under § 3142(c) can reasonably assure the appearance of the defendant and the safety of the community. 18 U.S.C. § 3142(e) ; Orta , 760 F.2d at 891.
I had the opportunity to consider the relationship between the "risk of flight" described in § 3142(f)(2)(A) as a precondition to a detention hearing, and the "risk of nonappearance" which must be mitigated in § 3142(e) in United States v. Ramirez-Hernandez , 910 F.Supp.2d 1155 (N.D. Iowa 2012). A number of courts have held that the "risk of flight" that triggers the option of detention must be a risk of volitional flight.[6] Those courts which focus *1126 on the "risk of flight" under 18 U.S.C. § 3142(f)(2) as a triggering condition for detention tend to hold that preventing "nonappearance" arising from the Government's actions under 18 U.S.C. § 3142(e) gets the BRA analysis backwards. Other courts have concluded, as I did in Ramirez-Hernandez , that the primary concern is "whether there are any conditions or combination of conditions that can reasonably assure the defendant's appearance as required,"[7] even if the defendant's nonappearance will be due to Governmental actions beyond the defendant's control. *1127 Ramirez Hernandez , 910 F.Supp.2d at 1160.
As I will discuss in detail below, there are several reasons to reconsider my conclusion in Ramirez-Hernandez. For now, I will highlight one case that has nothing to do with immigration detainers, reinstatement of prior removal orders or an imminent risk of the defendant's being removed from the United States. In United States v. Dimmick , 82 F.Supp.3d 866 (N.D. Iowa 2015), I considered whether the Bail Reform Act applied to a defendant who had been brought into federal custody from state custody in South Dakota on a writ of habeas corpus ad prosequendum. In determining the right of the defendant to request pretrial release, I stated:
Section 3142 addresses the question of whether a defendant in a federal criminal case should be released or detained pending trial. 18 U.S.C. § 3142. A defendant appearing in federal court on a Writ, however, is usually a prisoner elsewhere , such as in the custody of a state corrections agency. Thus, no "release" in a traditional sense (i.e. , the restoration of liberty) is possible. The question, instead, is whether the defendant stays in federal custody or returns to state custody while awaiting trial. In that situation, does Section 3142 still apply?
Federal courts addressing the situation have answered "yes." For example, in United States v. Troedel , No. 2:12-cr-81-FrM-29DNF, 2012 WL 4792457 (M.D. Fla. Oct. 9, 2012), a magistrate judge refused to conduct a detention hearing on the grounds that the defendant was not "eligible" for release, as he was an inmate at a county jail appearing on a Writ. Id. at *1. On review, the district judge vacated the detention order and recommitted the issue to the magistrate judge for a detention hearing, stating:
In this case, defendant's presence in federal custody was obtained by a writ of habeas corpus ad prosequendum. "The law is clear in this Circuit that, if a defendant is in state custody and he is turned over to federal officials for federal prosecution, the state government's loss of jurisdiction is only temporary ... A writ of habeas corpus ad prosequendum is only a 'loan' of the prisoner to another jurisdiction for criminal proceedings in the receiving jurisdiction." Causey v. Civiletti , 621 F.2d 691, 693 (5th Cir. 1980). Nothing in [ Section 3142 ] disqualifies such a person from receiving a detention hearing. United States v. Butler , 165 F.R.D. 68, 70 (N.D. Ohio 1996) ; United States v. Hayes , No. CR-07-45-HE, 2007 WL 708803 (W.D. Okla. Mar. 2, 2007). Other cases have referred to a detention hearing having been held in such situations without adverse comment. E.g., United States v. Forrest , 402 F.3d 678 (6th Cir. 2005) ; Headspeth v. Conley , 126 F.Supp.2d 1004 (S.D. W.Va. 2001).
The Court concludes that defendant is entitled to a hearing on the issue of release or detention, and if detention is sought, to a detention hearing under § 3142(f). The Court expresses no opinion as to whether defendant should be detained or released, only that he is entitled to a hearing to address the issues.
Id. at *1-2.
I have located no authority suggesting otherwise. Nor am I independently able to conclude that Section 3142 should not apply to a federal criminal defendant who appears on a Writ. Neither Section 3142 nor any other statute creates an exception for defendants appearing by Writ. Thus, I will analyze Dimmick's *1128 motion for release pursuant to Section 3142.
82 F.Supp.3d at 868-69 (emphasis added).
Although it did not involve immigration or the interplay of two federal agencies, my opinion in Dimmick is relevant to Villatoro-Ventura's case for three reasons. First, even though Dimmick did not have a true liberty interest in pretrial release - i.e., he was not likely to be released in the event of a favorable finding under the BRA - he was nevertheless entitled to the BRA's protections. Second, in Dimmick the fact that the defendant was certain to be spirited away back to South Dakota if I entered an order of release had no bearing on the BRA determination. See id. at 870-71 (applying § 3142(g) factors without discussion of the effect of detention in South Dakota). Finally, I rejected Dimmick's argument that "he will not be a risk of flight or danger to the community if released from federal custody because he would immediately return to state custody," because "Dimmick's argument, if adopted, would effectively mandate pretrial release from federal custody for any defendant appearing on a Writ." Id. at 870. I found that Congress could have specified if it intended another agency's or state's jurisdiction to create a per se rule in favor of detention or release in the BRA, but it did not do so. Id. Above all else, the BRA requires an individualized determination of the right to pre-trial release, with attention given to:
[T]he history and characteristics of the person, including-
(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings[.]
18 U.S.C. § 3142(g)(3)(A).
B. The Immigration and Nationality Act
The Immigration and Nationality Act of 1965, as amended, 8 U.S.C. § 1101, et seq. (INA), charges the U.S. Secretary of Homeland Security (DHS) with "the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens." 8 U.S.C. § 1103(a)(1). Relevant to Villatoro-Ventura's situation, the INA provides:
If [DHS] finds that an alien has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal, the prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed, the alien is not eligible and may not apply for any relief under this chapter, and the alien shall be removed under the prior order at any time after the reentry.
Id. at § 1231(a)(5). When an alien is subject to a removal order, the INA provides that the Executive Branch "shall remove the alien from the United States within a period of 90 days," or within the "removal period." Id. at§ 1231(a)(1)(A). By statute, the removal period commences on the latest of:
(i) The date the order of removal becomes administratively final.
(ii) If the removal order is judicially reviewed and if a court orders a stay of the removal of the alien, the date of the court's final order.
(iii) If the alien is detained or confined (except under an immigration process), the date the alien is released from detention or confinement.
Id. at§ 1231(a)(1)(B). The INA further directs that "during the removal period, *1129 [DHS] shall detain the alien." Id. at § 1231(a)(2). However, DHS "may not remove an alien who is sentenced to imprisonment until the alien is released from imprisonment." Id. at § 1231(a)(4)(A).
When § 1231(a)(5) is viewed in isolation, it appears certain that an alien subject to reinstatement of a prior removal order has no lawful options for remaining in the United States. However, despite the statutory language (and testimony) to the contrary, there are avenues available for challenging the reinstatement of a prior removal order.[8] A prior order of removal does not render an alien ineligible for "withholding of removal," or from relief under the United Nations Convention Against Torture (CAT).[9] There is a colorable argument that those who are subject to reinstatement of a prior removal order are nevertheless eligible to apply for relief under the Violence Against Women Act (VAWA)[10] if they have been the victim of a crime. Victims of trafficking who qualify for nonimmigrant status under § 1101(a)(15)(T) may also argue that § 1231(a) does not apply to them due to the existence of waivers of most inadmissibility grounds. See id. at §§ 1182(d)(13)-(14).
*1130 Aliens may file a motion to reopen or reconsider a prior order of removal prior to the reinstatement order. See 8 C.F.R. § 103.5 (regulations governing a motion to reopen). Finally, a reinstatement order can be challenged by collaterally attacking the reinstatement order in the Federal Circuit Courts of Appeals,[11] or in the context of criminal charges that depend on the validity of the underlying removal order. See, e.g., United States v. Mendoza-Lopez , 481 U.S. at 838, 107 S.Ct. 2148 (due process requires meaningful review of deportation order where it is an element of the subsequent imposition of a criminal sanction).
Beyond the possibility of Villatoro-Ventura stopping his own deportation despite the strict mandate of § 1231(a), certain regulations suggest ICE may delay reinstatement of the removal order and avoid tolling the 90 day removal period until the termination of Villatoro-Ventura's trial and criminal sentence. "A principal feature of the removal system is the broad discretion exercised by immigration officials," including "whether it makes sense to pursue removal at all." Arizona v. United States , 567 U.S. 387, 396, 132 S.Ct. 2492, 183 L.Ed.2d 351 (2012). First, ICE has the discretion to stay removal if it decides that "the alien is needed to testify in the prosecution of a person for a violation of a law of the United States or of any State." 8 U.S.C. § 1231(c)(2)(A). Second, 8 C.F.R. § 215.2(a) defines the authority of the departure-control officer (any immigration officer designated to supervise the departure of aliens, 8 C.F.R. § 215.1 ) to "prevent an alien's departure from the United States." The regulation provides:
No alien shall depart, or attempt to depart, from the United States if his departure would be prejudicial to the interests of the United States under the provisions of § 215.3. Any departure-control officer who knows or has reason to believe that the case of an alien in the United States comes within the provisions of § 215.3 shall temporarily prevent the departure of such alien from the United States and shall serve him with a written temporary order directing him not to depart, or attempt to depart, from the United States until notified of the revocation of the order.
8 C.F.R. § 215.2(a). Aliens whose departure would be "prejudicial to the interests of the United States" includes "[a]ny Alien who is needed in the United States as a witness in, or as a party to, any criminal case under the investigation or pending in a court in the United States." Id. at § 215.3(g). An alien who is a criminal defendant may be removed only "with the consent of the appropriate prosecuting authority," in this case, the USAO. Id. No court has offered a controlling interpretation of this statute, but it nevertheless weighs in favor of ICE being able to slow down the process.
Third, several courts addressing this issue have determined that the 90 day removal *1131 period does not commence until the alien is released "from confinement" under 8 U.S.C. § 1231(a)(1)(B), which includes the conditions of supervision imposed upon a defendant released pretrial under the BRA. See, e.g., United States v. Castro-Inzunza , No. 12-30205, 2012 WL 6622075, at *1 (9th Cir. July 23, 2012) (holding that the Government failed to show removal period for deportation "will begin while defendant is 'in custody' on pretrial release, subject to restraints not shared by the public generally that significantly confine and restrain his freedom"); Trujillo-Alvarez , 900 F.Supp.2d at 1174-75 (finding that the "removal period" under which ICE must remove deportable alien within 90 days under the INA does not begin to run until completion of criminal prosecution, that release on pretrial conditions constitutes confinement under the INA, and that therefore no legal or practical requirement mandates ICE detain an alien for removal prior to conclusion of criminal prosecution). Thus, contrary to ICE's statements that its hands are tied as a result of the 90 day deadline, it is possible that the 90 day deadline has not yet commenced. Of course, I cannot force the Executive Branch to exercise its discretion in any particular way. However, I will not ignore the fact that the Executive Branch has chosen one path out of many in resolving this case.
C. Cooperation and Conflict between ICE and the USAO
Villatoro-Ventura was arrested without a warrant under the authority of 8 U.S.C. § 1357(a), which states:
Any officer or employee of the Service authorized under regulations prescribed by [DHS] shall have power without warrant-
* * *
(2) to arrest ... any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest ...
* * *
(4) to make arrests for felonies which have been committed and which are cognizable under any law of the United States regulating the admission, exclusion, expulsion, or removal of aliens if he has reason to believe that the person so arrested is guilty of such felony and if there is likelihood of the person escaping before a warrant can be obtained for his arrest ...
8 U.S.C. § 1357(a)(2), (4). In any case in which ICE encounters an alien, ICE must make a determination whether to refer that alien for criminal prosecution, if applicable. ICE's Criminal Alien Program (CAP) Handbook, in defining the "General Guidelines for ERO Prosecution Program," states:
A supervisor or other designated third party within the agency should review all cases proposed for prosecution to verify the following:
1) Sufficient evidence exists to substantiate the offense being charged;
2) The elements of the offense being charged are satisfied;
3) Jurisdiction and venue questions have been correctly addressed; and
4) The applicable and appropriate prosecutorial guidelines have been followed.
Determination to Pursue Criminal Prosecution or Administrative Remedies: The resources of the federal judicial system are limited, and most violations of *1132 the INA encountered by ERO enforcement officers will be handled through removal proceedings. All prosecution programs should have a provision for a regular review of cases proposed for prosecutions. These reviews will assist ERO in determining whether administrative remedies can satisfactorily resolve the cases, or whether the violations cause such a serious impact on our society, innocent members of the public, and agency operations that criminal prosecution should be pursued.
CAP Handbook at 40-41. Thus, in each case in which an arrested alien is referred to the USAO for unlawful reentry prosecution, an exercise of discretion has been made. Similarly, whenever the USAO must decide whether to pursue charges for unlawful re-entry, the USAO must make a discretionary determination as to whether the charges are an appropriate use of DOJ resources. See Sessions Memo at 2 ("Each District shall consider prosecution of 8 U.S.C. § 1326 for each illegal reentrant. Priority, however, must be given to defendants who have been convicted of an aggravated felony, have any prior criminal history indicating the defendant poses a danger to public safety, have one or more administrative or criminal immigration violations, gang membership or affiliation, or where other aggravating circumstances are present.").
Several courts have commented on the fact that ICE and the USAO appear to start these cases in apparent agreement as to the correct course of action, yet reach an insuperable conflict upon the defendant's exercise of his or her rights under the BRA.[12] To the best of my knowledge, after considerable research, no court addressing this issue has been able to explain this diversion of interests within the Executive Branch.
V. DISCUSSION
A. The Government's Motion to Revoke the Release Order
As noted above, I find that this case requires me to revisit my 2012 ruling in Ramirez-Hernandez. At that time, I wrote that the case presented "the relatively unusual case of a defendant for *1133 whom detention and removal by the immigration authorities prior to the conclusion of prosecution appear[ed] to be a certainty" in ordering detention. 910 F.Supp.2d at 1159. The situation in which pretrial release is considered while a defendant faces an immigration detainer is no longer so unusual. Three cases in the Southern District of Iowa are presently addressing the situation,[13] another case in this district addressed it earlier this year,[14] and two circuit courts of appeal[15] have had occasion to address the situation.[16] In 2017, the offense of illegal re-entry comprised 23.6% of all federal criminal sentences and 81.6% of all immigration offenders.[17] Nearly every defendant charged with illegal reentry will have a prior order of removal that ICE will attempt to reinstate. See 8 U.S.C. § 1326. The prospect of denying pretrial release to 24% of defendants, as a matter of course and without *1134 an individualized determination under the BRA, raises constitutional concerns.[18]
For many reasons, I find that my opinion in Ramirez-Hernandez has no precedential value. First, the record before me in that case indicated, without refutation, that the defendants' removals, if they were released from Marshal custody, would be certain and immediate. Neither party argued or suggested that ICE may have discretion to delay removal. As discussed above, it is now clear that the situation is not so simple.
Second, my opinion in Ramirez-Hernandez did not expressly address the two-step inquiry for resolving pre-trial detention issues, as outlined in Delgado , 985 F.Supp.2d 895, 897. At the first step, if the charged offense does not fall within the scope of 18 U.S.C. § 3142(f)(1), detention is not an option unless the case involves either (1) "a serious risk that [the defendant] will flee" or (2) "a serious risk that [the defendant] will" engage in specified acts to obstruct justice. 18 U.S.C. § 3142(f)(2). In Ramirez-Hernandez , I addressed the "risk of nonappearance" issue that arises at the second step of the BRA analysis without discussing the threshold issue of whether the defendants were likely to "flee" or to obstruct justice. Third, one of the cases I found persuasive, United States v. Castro-Inzunza , No. 3:11-cr-00418-MA, 2012 WL 1952652 (D. Ore. May 30, 2012), was overturned in an unpublished Ninth Circuit Court of Appeals opinion before I issued the order in Ramirez-Hernandez.
Finally, two of the three defendants in Ramirez-Hernandez pleaded guilty before their appeals of my detention order could be resolved. See United States v. Ramirez-Hernandez , No. CR12-4111-DEO at Doc. Nos. 17 (appeal of magistrate judge order of detention), 30 (notice of withdrawal of appeal), and 39 (order accepting guilty plea); United States v. Roque-Castro , CR12-3053-MWB at Doc. Nos. 16 (appeal of magistrate judge order of detention), 21 (order granting motion to withdraw appeal) and 29 (order accepting guilty plea). However, in United States v. Millan-Vasquez , CR12-4102-DEO, my order was appealed to the Honorable Donald E. O'Brien. Id. at Doc. No. 12. While Judge O'Brien adopted my order as it applied to the facts of Millan-Vasquez's particular case, he declined to adopt a "rule, de facto or otherwise" that would detain all similarly situated defendants. Id. at Doc. No. 24. On interlocutory appeal, the Eighth Circuit Court of Appeals similarly cautioned against a per se rule of detention for those in Millan-Vasquez's position. United States v. Millan-Vasquez , 13-1324 at *4-5 (8th Cir. Apr. 18, 2013). Specifically, the court acknowledged that "the magistrate judge's rationale raises serious constitutional questions that should be avoided by a narrowing construction of the Bail Reform Act." Id. at *5. The Eighth Circuit issued a limited remand for the "purpose of requesting the district court to clarify whether it determines that Millan-Vasquez presents a serious risk of flight of his own volition , such that no conditions will reasonably assure his appearance as required if he is released into the community." Id. (emphasis added). Judge O'Brien ultimately ordered Milan-Vasquez detained without regard to the ICE detainer, based on the factors in § 1342(g). Id. at Doc. No. 54.
*1135 In short, and unlike the present case, Ramirez-Hernandez suffered from a limited factual record and poorly-developed legal arguments. Now that I have the opportunity to revisit the issue, I decline to follow my holding in that case. I instead adopt the reasoning and holdings of the Ninth and Tenth Circuits in Santos-Flores and Ailon-Ailon. A risk of involuntary removal does not, by itself, establish "a serious risk that such person will flee," such that the Government may seek pre-trial detention pursuant to § 3142(f)(2)(A). As in Dimmick , I hold that the BRA does not create an exception for a defendant who is subject to detention outside of my jurisdiction. The question of whether this court should order Villatoro-Ventura to be detained pending trial must be resolved pursuant to the BRA without regard to whether the Executive Branch might remove him from the country if he is released.
1. Villatoro-Ventura is not properly detained under 18 U.S.C. § 3142(d).
As discussed above, the BRA allows for the temporary detention of aliens if the court determines that the defendant "is not a citizen of the United States or lawfully admitted for permanent residence." 18 U.S.C. § 3142(d)(2). However, that section does not apply to this case. ICE is already aware of Villatoro-Ventura's status as an illegal alien, as it was the entity that conveyed him to Marshal custody. "If [DHS] fails or declines to take such person into custody during that period, such person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings."Id. Thus, I must conduct the usual BRA analysis under §§ 3142(e) and (f).
2. Villatoro-Ventura is not properly detained under 18 U.S.C. §§ 3142(f)(1) or (2).
At the first step of the BRA analysis, I must consider whether the Government has shown, by a preponderance of the evidence, that it is authorized to seek detention under §§ 3142(f)(1) or (2). Illegal reentry under 8 U.S.C. § 1326 is not one of the enumerated crimes for which pretrial detention may be sought under § 3142(f)(1). The Government has not alleged that there is a serious risk that Villatoro-Ventura will attempt to obstruct justice. 18 U.S.C. § 3142(f)(2)(B). Therefore, the issue is whether the Government has established, by a preponderance of the evidence, that there is a serious risk that Villatoro-Ventura will flee.
The Government has not submitted evidence that Villatoro-Ventura is likely to flee on his own volition, rather, the Government focuses on the "nonappearance" element under § 3142(e). This argument misses the mark. I cannot reach the question of whether there are conditions which will reasonably assure Villatoro-Ventura's appearance without addressing first whether Villatoro-Ventura is subject to detention under § 3142(f)(2)(A).
Considering all of the evidence in the record, including the additional evidence received during the hearing I conducted on August 27, 2018, I do not find a serious risk that Villatoro-Ventura will flee. He was born in El Salvador and earned the equivalency of a high school diploma in that country. However, with only one interruption, he has lived in Sioux City, Iowa, from the time he was 18. Villatoro-Ventura became an LPR and graduated from Sioux City West High School in 1999. After graduating, he maintained steady employment from 1999 to 2011. Although he was convicted in October 2001 of attempted burglary in the third degree and *1136 rioting, Villatoro-Ventura (then age 21) was given a suspended prison sentence and ordered to serve a two-year term of probation. Villatoro-Ventura successfully discharged his probation in September 2002, after only 11 months, and has not had any involvement with law enforcement (excepting his immigration troubles) since. While the ICE witness testified that these 2001 convictions rendered Villatoro-Ventura deportable, he was not deported until 2011.
Villatoro-Ventura has strong family and community ties. His wife, two children, mother, father and three siblings all reside in Sioux City. Thirteen of Villatoro-Ventura's family members have LPR status or are United States citizens. Villatoro-Ventura's wife owns a residence in Sioux City. Although Villatoro-Ventura faces a potential term of incarceration and serious immigration consequences arising from his return to the United States, he has never missed a court date in immigration, state or federal court. Nor has he ever attempted to flee any jurisdiction or failed to comply with probation or pretrial release conditions. To my knowledge, Villatoro-Ventura has not indicated that he would prefer deportation to facing criminal charges. Indeed, the evidence strongly suggests that Villatoro-Ventura's primary motivation in returning to the United States, and in litigating this case, is to be with his family.
In light of these facts, I find no serious risk that Villatoro-Ventura will flee. Thus, the Government has failed to show that it is authorized to seek pretrial detention under § 3142(f)(1) or (2). While this ends the BRA analysis and rules out pretrial detention, I will also address, in the alternative, the second step of the analysis.[19]
3. The factors under 18 U.S.C. § 3142(g) also favor release
Even if I were to move on to the second step, and consider whether any conditions or combination of conditions could reasonably assure Villatoro-Ventura's appearance for trial, I would not order him detained under 18 U.S.C. § 3142(e)(1). At the outset, to avoid potential constitutional issues, I will analyze the § 3142(g) factors without regard to the Executive Branch's plans for Villatoro-Ventura. Such an analysis weighs in favor of releasing Villatoro-Ventura subject to the conditions imposed by Judge Mahoney.
a. Nature and Circumstances of the Offense Charged
As previously stated, illegal reentry under 8 U.S.C. § 1326 does not carry a presumption of detention. In Villatoro-Ventura's case, an LPR was deported due to 10-year-old conviction for which he *1137 served no jail time. There is no allegation that his reentry, apart from being unlawful, harmed any particular person or place. If convicted in this case, Villatoro-Ventura will face a likely guideline range of zero to six months imprisonment.[20] Although the Government certainly has the right to exclude non-citizens, and to punish those who do not use the appropriate means to enter the country in order to deter others from doing so, there is nothing about Villatoro-Ventura's allegedly unlawful actions in this case to suggest that this is a crime for which pretrial detention is appropriate.
b. Weight of the Evidence
Judge Mahoney found that the weight of the evidence against Villatoro-Ventura was strong, and that this factor weighed in favor of detaining him pretrial. However, Villatoro-Ventura has now offered "newly received information" (Doc. No. 49) suggesting that he has a colorable collateral challenge to his removal. See, e.g., United States v. Limones-Valles , No. CR16-4060-LTS, 2016 WL 7489446, at *3 (N.D. Iowa Dec. 30, 2016) (if the defendant was erroneously deported as an aggravated felon, such removal may not form the basis of an illegal reentry conviction). While it is premature to address the effect of this new information, it does suggest that the weight of the evidence against Villatoro-Ventura may not be as strong as it was at the time of Judge Mahoney's hearing. Nevertheless, this factor weighs in favor of detention.
c. History and Characteristics of the Person
Here, I need not repeat my above findings regarding Villatoro-Ventura's history and characteristics. His criminal history is negligible. He has a strong work history and strong family connections in this area. During the August 27 hearing, the Government presented evidence casting doubt on Villatoro-Ventura's recent work history, including evidence that his purported employer denies the existence of an employment relationship. Doc. No. 60 at 1. Of course, because of Villatoro-Ventura's immigration status it is unlikely that any employer would freely acknowledge employing him. Nonetheless, I agree with the Government that this apparent discrepancy as to Villatoro-Ventura's recent employment is a factor that weighs against release. I find, however, that this factor does not overcome the many other factors that support release.[21]
As for family connections, the Government actually argues that Villatoro-Ventura's strong connections to his family weigh against release. The Government's theory is that his family has harbored him and returning to his family would therefore encourage ongoing criminality. According to the Government, "an illegal alien released on bond would effectively need to be self-sufficient and live independently," and that returning Villatoro-Ventura to his family would encourage their "further criminality." Doc. No. 27-1 at 13. I disagree.[22] First, individuals do not commit *1138 the crime of harboring an alien under 8 U.S.C. § 1324(a)(1)(A)(iii) simply by allowing a relative or acquaintance to live with them. See United States v. Costello , 666 F.3d 1040 (7th Cir. 2012). There must be some evidence of affirmative actions taken to shield the alien from detection. Second, the conditions Judge Mahoney imposed, which include electronic monitoring and no employment that would be contrary to law, preclude the possibility of any future actions that could be construed to be unlawful harboring.
In short, I find that Villatoro-Ventura's history and characteristics weigh heavily in favor of pretrial release.
d. The Nature and Seriousness of the Danger to any Person or to the Community
The Government has not alleged that Villatoro-Ventura's release would put any person or the community in danger. Nor would the record support such an argument. This factor weighs in favor of pretrial release.
4. Motion to Revoke - Conclusion
For the reasons set forth above, I find that temporary detention pursuant to 18 U.S.C. § 3142(d) is not applicable and that the Government has not shown that it is entitled to seek pretrial detention pursuant to 18 U.S.C. § 3142(f)(1) or (f)(2). I further find that even if the Government was otherwise entitled to seek pretrial detention, the factors set forth in 18 U.S.C. § 3142(g) weigh in favor of release pursuant to the conditions of release imposed by Judge Mahoney. As such, the Government's motion to revoke the release order is denied .
B. Villatoro-Ventura's First Motion to Dismiss
Villatoro-Ventura notes that after Judge Mahoney entered the release order under the BRA, the Government did not actually release him. Instead, he was transferred from Marshal custody to ICE custody, was listed as an ICE detainee, and was moved from the Plymouth County Jail to the Marshall County Jail. He contends that this conduct violated both the BRA and his constitutional rights and seeks dismissal with prejudice as a remedy. See Doc. No. 29-1. I will address the statutory and constitutional arguments separately.
1. The Statutory Argument
Villatoro-Ventura relies on certain language contained in 18 U.S.C. § 3142(d) and, quoting a federal district court decision addressing similar circumstances, states: "The upshot of this is simple: the BRA requires the Executive Branch to decide between pursuing a criminal prosecution or immigration proceedings. The Executive cannot pursue both at the same time." Doc. No. 29-1 at 7 (quoting United States v. Rangel , 318 F.Supp.3d 1212, 1217-18 (E.D. Wash. 2018) ). As Villatoro-Ventura points out, several other federal district courts have reached similar conclusions based on Section 3142(d). Doc. No. 29-1 at 7-8 n.28 (collecting cases). One court has stated:
[O]nce a criminal prosecution is initiated and the Government has invoked the jurisdiction of a federal district court, the Bail Reform Act is controlling. When an Article III court has ordered a defendant released, the retention of a defendant in ICE custody contravenes a determination made pursuant to the Bail Reform Act. As such, the Government's criminal prosecution cannot proceed and must be dismissed with prejudice .... As noted in [ United States v. Ventura , No. 17-cr-418 (DLI), 2017 WL 5129012 (E.D.N.Y. Nov. 3, 2017) ], this issue has not been addressed by the Second Circuit *1139 Court of Appeals or any other circuit court, but other district courts that have addressed this issue are in accord. Ventura , 2017 WL 5129012, at *2.
United States v. Boutin , 269 F.Supp.3d 24, 26 (E.D.N.Y. 2017). Because the first published opinion to adopt this reasoning appears to be United States v. Trujillo-Alvarez , 900 F.Supp.2d 1167 (D. Or. 2012), I will refer to it as the Trujillo-Alvarez reasoning.
Having reviewed Trujillo-Alvarez and its progeny, I do not find the "upshot" to be as simple as suggested by some of my colleagues. For starters, and as addressed in Section IV(B), supra , Congress has given ICE express statutory authority through the INA to detain and remove certain aliens. I find no language in the INA that subordinates this authority to the BRA. Instead, at least on its face, the INA is an independent statutory scheme that permits the detention and removal of individuals under specified circumstances.
Courts adopting Trujillo-Alvarez reasoning, and thereby holding that the Government cannot simultaneously pursue criminal prosecution and immigration proceeding, rely on the BRA - specifically 18 U.S.C. § 3142(d). See, e.g., Rangel , 318 F.Supp.3d at 1217-18. That section states:
(d) Temporary Detention To Permit Revocation of Conditional Release, Deportation, or Exclusion .-If the judicial officer determines that-
(1) such person-
(A) is, and was at the time the offense was committed, on-
(i) release pending trial for a felony under Federal, State, or local law;
(ii) release pending imposition or execution of sentence, appeal of sentence or conviction, or completion of sentence, for any offense under Federal, State, or local law; or
(iii) probation or parole for any offense under Federal, State, or local law; or
(B) is not a citizen of the United States or lawfully admitted for permanent residence, as defined in section 101(a)(20) of the Immigration and Nationality Act ( 8 U.S.C. 1101(a)(20) ); and
(2) such person may flee or pose a danger to any other person or the community;
such judicial officer shall order the detention of such person, for a period of not more than ten days, excluding Saturdays, Sundays, and holidays, and direct the attorney for the Government to notify the appropriate court, probation or parole official, or State or local law enforcement official, or the appropriate official of the Immigration and Naturalization Service. If the official fails or declines to take such person into custody during that period, such person shall be treated in accordance with the other provisions of this section, notwithstanding the applicability of other provisions of law governing release pending trial or deportation or exclusion proceedings. If temporary detention is sought under paragraph (1)(B) of this subsection, such person has the burden of proving to the court such person's United States citizenship or lawful admission for permanent residence.
18 U.S.C. § 3142(d) (emphasis added). The underlined sentence, which I will refer to as the operative sentence, is said to force the Government to choose between criminal prosecution or immigration proceedings. See, e.g., Rangel , 318 F.Supp.3d at 1217-18 ; see also Trujillo-Alvarez , 900 F.Supp.2d at 1179.
In reviewing this section as a whole, I am unable to agree. First, as *1140 Villatoro-Ventura acknowledges, Judge Mahoney did not rely upon § 3142(d) in conducting her analysis under the BRA. See Doc. No. 17; see also Doc. No. 29-1 at 6. Indeed, the "temporary detention" authorized by § 3142(d) applies only if the court makes the findings described in both subparagraph (1) and subparagraph (2). See 18 U.S.C. § 3142(d) (using the word "and" between subparagraphs (1) and (2) ). Subparagraph (2) requires a finding that "such person may flee or pose a danger to any other person or the community." Id. at § 3142(d)(2). Judge Mahoney made no such finding. Thus, the temporary detention and notice provisions set forth in § 3142(d) were not triggered. The issue of whether Villatoro-Ventura should be released or detained pending trial in this case was instead resolved pursuant to the other provisions in § 3142, as described earlier in this order. Because Villatoro-Ventura was not released or detained pursuant to § 3142(d), I find it difficult to conclude that § 3142(d) has any applicability to this case.
Second, given the broad scope of subparagraph (1) of § 3142(d), the Trujillo-Alvarez reasoning assumes a Congressional intent to limit detention and prosecution decisions by state and local governments in addition to Executive Branch agencies. Subparagraph (1) applies when, for example, a defendant is "on ... probation or parole for any offense under Federal, State, or local law." 18 U.S.C. § 3142(d)(1). If a defendant charged with a federal offense is under state probation, the court could order temporary detention for ten days (or less) and direct the USAO to notify the "appropriate" state probation official. Under § 3142(d), the state government would have the option of taking the defendant into custody during the temporary detention period. Id. at § 3142(d) ("If the official fails or declines to take such person into custody during that period ..."). Under the Trujillo-Alvarez reasoning, however, this would be the state government's only opportunity to take the defendant into custody. Thus, if the state did not act quickly enough and the federal court determined that release under the BRA was appropriate, the state would be barred from taking the defendant into custody and initiating revocation proceedings while the defendant was awaiting his or her federal trial.[23]
I find no support, in the statutory language or elsewhere, for a Congressional intent to impose such restrictions on sovereign state governments. Federal courts can, and often do, issue writs of habeas corpus ad prosequendum to have state prisoners transferred to federal custody to face charges. That is a far cry, however, from dictating to a sovereign state government that it is not allowed to arrest a federal defendant for a state parole or probation violation while the defendant is on federal pretrial release. Further, I find nothing in § 3142(d) to suggest that Congress intended it to provide the exclusive remedy for state government or ICE officials when a defendant is charged with a federal offense. It does not state, for example, that such officials are prohibited from deferring action on a pending matter and, instead, filing a detainer to take effect upon a defendant's prospective release from federal criminal custody. Rather, I *1141 conclude that Section 3142(d) provides a mechanism to prioritize the disposition of previously pending cases over any recently filed federal criminal charge, should the specified other "officials" so elect. Because § 3142(d) expressly applies to individuals who may be subject to detention and prosecution by state or local governments, in additional to Executive Branch agencies, I find that the Trujillo-Alvarez reasoning reads far too much into the operative sentence of that section.
Even if § 3142(d) was written to apply only to the Executive Branch, I would not be able to stretch the operative sentence to reach the broad result that a defendant released under the BRA cannot be detained under the INA. In reading that section in its entirety, I find that its purpose is to ensure that various "officials," including ICE officials, receive notice about certain defendants who pose a flight or safety risk in order to give the relevant officials in a particular case an opportunity to take immediate custody of the defendant with regard to other pending matters. If the relevant officials do not take advantage of that opportunity during the short, temporary detention period, then the federal district court must proceed with the normal BRA analysis to determine if the defendant should be released or detained pursuant to the BRA. To the extent that § 3142(d) has any relevance to this case, I construe the operative sentence to mean, simply, that in making its decision under the BRA, the court must apply "the other provisions of this section" without considering "other provisions of law governing release pending trial or deportation or exclusion proceedings." 18 U.S.C. § 3142(d). In other words, whether release is warranted under the BRA, the court cannot take into account the possibility that the defendant will be deported, or will be subjected to state court revocation proceedings. See Dimmick , 82 F.Supp.3d 866 (completing the BRA determination without regard for the fact that the state of South Dakota would take the defendant into custody if he were to be released from Marshal custody).
In short, and in the absence of controlling authority, I decline to adopt the Trujillo-Alvarez reasoning, as I find that it is supported neither by the statutory text or any indicia of Congressional intent. This does not mean I am unsympathetic to the policy outcome that results from the Trujillo-Alvarez reasoning. As indicated previously in this order, I am perplexed by the Executive Branch's practice of seeking deportation while a defendant is awaiting trial on a federal criminal charge. Congress could, and maybe should, provide a legislative solution to this practice. However, in the absence of clear authority otherwise, I do not find it appropriate for the federal courts to step in and save the Executive Branch from its own, baffling decisions.
Finally, I note that relief may be warranted in a particular case if it becomes clear that the Executive Branch is using ICE solely to hold a defendant for his or her federal criminal trial after the court has ordered release under the BRA. A policy of simply stashing a defendant in ICE custody, with no effort to proceed under the INA, would raise serious concerns as to the defendant's rights under the BRA. Here, however, it is apparent that ICE moved forward with removal proceedings after Villatoro-Ventura was released from Marshal custody and transferred to ICE custody. As noted above, he was moved to a different holding facility and, according to the Government, was scheduled to be removed from the United States within two weeks of July 20, 2018, the date the Government filed its motion to revoke the release order. See Doc. No. 27-1 at 8.
*1142 Thus, there is no evidence that in this case the Government attempted to evade Judge Mahoney's release order under the BRA by using ICE detention as a proxy for pretrial detention. If that does occur in a particular case, I will almost certainly consider it to be a violation of the BRA and will fashion an appropriate remedy. Here, however, I find that ICE detained Villatoro-Ventura for the purpose of removing him from the country - regardless of the impact such removal would have on this case - and would have done so had I not issued writ of habeas corpus ad prosequendum. ICE's actions did not violate Villatoro-Ventura's rights under the BRA.
2. The Constitutional Arguments
Villatoro-Ventura makes abbreviated arguments that the Government has violated, and likely intends to continue to violate, his rights under the Fifth, Sixth and Eighth Amendments. Doc. No. 29-1 at 9-11. With regard to the Fifth Amendment, he notes that due process requires fundamental fairness and then states:
When the Executive Branch ignores a Court's release order; keeps a defendant in jail despite that order; moves him to a jail 200 miles away from the Court, his family, and his attorney; and threatens to remove him from the country before he can answer to the criminal charge, the proceedings are simply unfair.
Id. at 10 (footnote omitted) (citing Trujillo-Alvarez , 900 F.Supp.2d at 1180 ). As with my conclusion concerning the BRA, it is possible to imagine scenarios in which the Executive Branch could interfere with a defendant's due process rights by proceeding under the INA. For example, if a defendant released under the BRA is taken into ICE custody, transferred to a facility in another part of the country and actually (or practically) deprived of access to his federal criminal defense attorney, due process concerns would naturally arise. Similarly, if ICE removes a defendant from the country while a criminal case is pending and the USAO attempts to try the defendant in absentia , that would raise serious issues, as well.
None of these hypothetical issues have occurred in this case. While Villatoro-Ventura was moved to the Marshall County, Iowa, jail for a short period of time after being released from Marshal's custody and taken into ICE custody, there is no evidence that this temporary placement actually impacted his ability to confer with his attorney or to assist in his defense of this case. Nor has Villatoro-Ventura cited authority for the proposition that being held at a facility that is less than a four-hour (one way) drive from the venue of a federal criminal case constitutes a due process violation. Thus, while it is possible that due process issues could arise when the Government proceeds with simultaneous deportation and criminal prosecution proceedings, Villatoro-Ventura has not shown that his Fifth Amendment rights have been violated.
As for the Sixth Amendment, Villatoro-Ventura states that ICE's conduct "threatens" his right to counsel, referencing his transfer to the Marshall County Jail and his possible removal from the country. Based on what has actually occurred so far, I find no Sixth Amendment violation. As with the Fifth Amendment, the situation may well be different if the Executive Branch removes Villatoro-Ventura from the country and then attempts to proceed to trial without him.
Villatoro-Ventura's Eighth Amendment argument is based on the premise that the Government has violated the BRA and, by extension, has violated that Eighth Amendment's prohibition of excessive bail. Because I have found no BRA violation, this argument necessarily fails.
*1143 3. The First Motion to Dismiss - Conclusion
I decline to adopt the Trujillo-Alvarez reasoning and, therefore, find that 18 U.S.C. § 3142(d) does not prohibit ICE from proceeding against Villatoro-Ventura under the INA simply because he is entitled to pretrial release under the BRA. I further find that, at least to date, Villatoro-Ventura's rights under the BRA and under the United States Constitution have not been violated. Because no violations have occurred, I need not consider the appropriate remedy. Villatoro-Ventura's first motion (Doc. No. 29) to dismiss is denied .
VI. CONCLUSION
I have denied the Government's motion to revoke the release order. Thus, Villatoro-Ventura is entitled to be released from Marshal's custody pending his trial in this matter, subject to the conditions of release imposed by Judge Mahoney. I will not protect the Executive Branch from itself by keeping the July 25, 2018, writ of habeas corpus ad prosequendum (Doc. No. 33) in place. As such, that writ is hereby annulled .
Once Villatoro-Ventura is released from Marshal's custody, the Executive Branch will be free (through ICE) to detain him and move forward with removal proceedings under the INA, if it so chooses. For the reasons set forth in Section V(B)(1), supra , I find that that the BRA does not prohibit such action. Of course, if Villatoro-Ventura is removed from this country before trial, or is otherwise detained in such a manner as to impair his ability to defend this case, his counsel may file a renewed motion to dismiss or for other relief, as may be appropriate.
To conclude, for the reasons set forth herein:
1. The Government's motion (Doc. No. 27) to revoke release order is denied .
2. The July 25, 2018, writ of habeas corpus ad prosequendum (Doc. Nos. 32, 33) is hereby annulled .
3. Defendant shall be released from the custody of the United States Marshal, subject to the conditions set forth in the appearance bond and order setting conditions of release (Doc. No. 14).
4. Defendant's first motion (Doc. No. 29) to dismiss the indictment (Doc. No. 1) with prejudice is denied .
IT IS SO ORDERED.

Villatoro-Ventura has filed a second motion (Doc. No. 49) to dismiss the indictment on the basis of a collateral attack on the underlying removal order. See United States v. Mendoza-Lopez , 481 U.S. 828, 107 S.Ct. 2148, 95 L.Ed.2d 772 (1987). I will not address that motion in this order. However, some of the issues raised in the second motion are relevant to Villatoro-Ventura's request for pretrial release. Regardless, nothing in this order should be construed to affect the outcome of the second motion to dismiss.

Aliens in removal proceedings may generally be arrested and detained pending a decision on whether the alien is to be removed from the United States. See 8 U.S.C. § 1226(a). As in the federal court system, an alien in removal proceedings may be released pre-hearing. In immigration proceedings, the initial custody determination is made by the district director (a local immigration officer, 8 C.F.R. § 215.1 ), who may order release on recognizance or may set a bond. An alien may appeal the initial custody determination to an IJ at any time before a removal order becomes final; however, the IJ may not release an alien without the imposition of a $1,500 bond under 8 U.S.C. § 1226(a)(2). Although some aliens are not eligible for bond as a matter of course (see 8 U.S.C. § 1226(c) ), all aliens appealing a detention order, including those ineligible for bond under § 1226(c), are entitled to an individualized determination of their case. Matter of Joseph , 22 I & N Dec. (BIA 1999). In an immigration bond hearing, the alien carries the burden of proving that he or she merits bond by proving that he or she (1) does not pose a danger to the community and (2) is not a flight risk. Matter of Urena , 25 I. & N. Dec. 140, 141 (BIA 2009) ; see also 8 C.F.R. §§ 236.1(c)(8), 1236.(1)(c)(8). The IJ assesses these factors based on the alien's criminal history, ties to the United States, employment history, record of appearance in court, history of immigration violations, attempts to flee persecution, manner of entry into the United States, and avenues for immigration relief. Matter of Guerra , 24 I. & N. Dec. 37 (BIA 2006) ; Matter of Ellis , 20 I. & N. Dec. 641 (BIA 1993).

See, e.g. , U.S. ICE/ERO, 1 Criminal Alien Program Handbook at 40-41, ERO 11157.1 (May 14, 2013), available at https://www.americanimmigrationcouncil.org/sites/default/files/foia_documents/access_to_counsel_ice_production_9-25-2014.pdf (hereinafter CAP Handbook); Jefferson B. Sessions, Renewed Commitment to Criminal Immigration Enforcement , Memorandum (Apr. 11, 2017), available at https://www.justice.gov/opa/press-release/file/956841/download (hereinafter Sessions Memo). I may take judicial notice of these administrative policies pursuant to Federal Rule of Evidence 201.

ICE has filed an immigration detainer in this case. This type of detainer
serves to advise another law enforcement agency that [DHS] seeks custody of an alien presently in the custody of that agency, for the purpose of arresting and removing the alien. The detainer is a request that such agency advise [DHS], prior to release of the alien, in order for [DHS] to arrange to assume custody, in situations where gaining immediate physical custody is either impracticable or impossible.
8 C.F.R. § 287.7. Officer Green represented at the July 6, 2018, hearing that if Villatoro-Ventura were ordered released, ICE would take him into custody on the detainer and commence deportation proceedings, which he characterized as automatic and irreversible. However, I note that the ICE detainer in this case states that the pretrial release decision in this case should not be impacted by Villatoro-Ventura's immigration status or the detainer:
This detainer arises from DHS authorities and should not impact decisions about the alien's bail , rehabilitation, parole, release, diversion, custody classification, work, quarter assignments, or other matters.
Doc. No. 16 (emphasis added).

The Government argues in its motion to revoke the release order that "electronic monitoring does nothing to ensure appearance. At best it would give notice that a defendant has a head start on flight." Doc. No. 27-1 at 14. This contention suggests the Government seeks "guarantees" of Villatoro-Ventura's presence at trial, rather than "reasonable assurances."

See United States v. Ailon-Ailon , 875 F.3d 1334, 1337 (10th Cir. 2017) ("We agree ... that a risk of involuntary removal does not establish a 'serious risk that [the defendant] will flee' upon which pre-trial detention may be based."); United States v. Santos-Flores , 794 F.3d 1088, 1091-92 (9th Cir. 2015) ("The risk of nonappearance referenced in § 3142 must involve an element of volition. If the government, by placing [the defendant] in immigration detention or removing him, jeopardizes the district court's ability to try him, then the district court may craft an appropriate remedy. The court may not, however, substitute a categorical denial of bail for the individualized evaluation required by the BRA.") (cleaned up); United States v. Clemente-Rojo , Criminal Action No. 14-10046-MLB, 2014 WL 1400690, at *3 (D. Kan. Apr. 10, 2014) ("The court must determine that defendant herself is a risk of flight and not that the government, which has chosen to charge defendant, will later deport her."); United States v. Trujillo-Alvarez , 900 F.Supp.2d 1167, 1176-77 (D. Or. 2012) (concluding "failure to appear" in the BRA referenced volitional flight); United States v. Villanueva-Martinez , 707 F.Supp.2d 855, 857 (N.D. Iowa 2010) (" '[F]ailure to appear' as used in the [BRA] is limited to the risk that the defendant may flee or abscond, that is, that he would fail to appear by virtue of his own volition, actions and will."); United States v. Barrera-Omana , 638 F.Supp.2d 1108, 1111 (D. Minn. 2009) ("The Court must conclude that the risk of flight with which Congress was concerned was not a flight flown or paid for by a federal governmental agency. The risk of nonappearance referenced in [§ 3142 ] has to involve an element of volition."); United States v. Montoya-Vasquez , No. 4:08CR3174, 2009 WL 103596 at *4 (D. Neb. Jan 13, 2009) ("The [BRA] does not permit this court to speculate on the 'risk' that a defendant would not appear in this court due to his being removed from this country by the same government that is prosecuting him .... If the government - through ICE or any other authority - prevents his appearance, he has not 'failed' to appear."); United States v. Rembao-Renteria , No. 07mj399 (JNE/AJB), 2007 WL 2908137 (D. Minn. Oct. 2, 2007) ("[T]he certainty of deportation does not translate into certainty of flight.").

United States v. Castro-Inzunza , No. 3:11-cr-00418-MA, 2012 WL 1952652, at *7 (D. Or. May 30, 2012) ("[O]nce removed, there are no conditions which will reasonably assure defendant's presence for trial."), rev'd , No. 12-30205, 2012 WL 6622075 (9th Cir. Jul. 23, 2012) ; United States v. Vencomo-Reyes , No. Cr11-2563JB, 2011 WL 6013546 (D.N.M. Nov. 28, 2011) ("The Court finds the reasoning that a defendant subject to an ICE detainer may present a substantial risk of nonappearance - perhaps through no fault of his own - more persuasive, more consistent with the Tenth Circuit's precedent ... and more consistent with the Court's prior opinions."); United States v. Ong , 762 F.Supp.2d 1353, 1363 (N.D. Ga. 2010) ("Since [the defendant] would likely be removed from the United States and not allowed to re-enter ... there are no conditions or set of conditions that will reasonably assure [his] presence as required."); United States v. Lozano , No. 09-158, 2009 WL 3052279, at *4 (M.D. Ala. Sept. 21, 2009) (finding that where an ICE detainer exists, "the government has met the correct standard, as it has established by a preponderance of the evidence that no condition or combination of conditions will reasonably assure defendant's appearance as required for prosecution under the instant indictment."); United States v. Sanchez-Valdivia , No. 08-342, 2008 WL 5104688, at *3 (D. Minn. Nov. 26, 2008) (finding that "there is no set of conditions that will ensure the Defendant's future appearance in this Court ... "[i]n the event the Defendant remains on release, he will be arrested by ICE and there is a substantial likelihood that he will immediately be removed to Mexico."); United States v. Pantaleon-Paez , No. 07-292, 2008 WL 313785, at *4 (D. Id. Feb. 1, 2008) ("In light of ICE's imminent detention and subsequent deportation efforts in the event of Defendant's release, it cannot be said that there is any condition or combination of conditions that will assure his appearance at trial."); United States v. Rice , No. 3:04CR-83-R, 2006 WL 1687749, at *6 (W.D. Ky. June 19, 2006) ("The detainer has two practical effects on the Court's ability to secure [defendants'] appearance in this case: one, if they are released from the Court's detention, they will likely be detained by [ICE], deported, and would then not be available to stand trial .... [T]he evidence supporting [defendants'] detention is very strong, and they should continue to be detained."). Vencomo-Reyes has likely been overruled by the Tenth Circuit's ruling in Ailon-Ailon. Pantaleon-Paez has likely been overruled by the Ninth Circuit's ruling in Santos-Flores.

I make no finding regarding Villatoro-Villanueva's specific eligibility for any kind of immigration relief, and further acknowledge that it is possible that - pending a challenge to the underlying order of removal - he is subject to an admissibility bar which may require him to apply for any immigration benefit from outside of the United States. See generally 8 U.S.C. 1182(a)(9) (governing the inadmissibility for a given time period, absent DHS consent, of certain aliens previously removed). This section simply addresses the Government's argument that removal is "certain."

To establish eligibility for withholding of removal, the applicant must establish that "his or her life or freedom would be threatened in the proposed country of removal on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 C.F.R. § 208.16(b) ; see also 8 U.S.C. § 1231(b)(3) ("[DHS] may not remove an alien to a country if [DHS] decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion."). Under Article 3 of the CAT, the United States has agreed not to "expel, return ('refouler') or extradite" a person to another state where he or she would be tortured." It is the position of the DOJ (specifically, the Executive Office for Immigration Review (EOIR) ), that the United States must make withholding of removal and relief under the CAT available "[f]or persons subject to reinstatement, administrative removal, expedited removal, or other streamlined proceedings, excluding those relating to aliens inadmissible on security and related grounds." 64 Fed. Reg. 8478-01, 1999 WL 75823 (EOIR Feb. 19, 1999). As a result, EOIR has promulgated a rule which allows those aliens subject to reinstatement of a prior removal order under § 1231(a)(5) to seek a credible fear interview and begin the process of applying for relief from removal. Id.

VAWA created several options for alien crime victims to gain status. Under § 1154, an alien who entered into a marriage with a United States Citizen (USC) or Legal Permanent Resident (LPR) and was subsequently "battered or ... the subject of extreme cruelty perpetrated by the alien's spouse" may apply for a permanent resident visa without the (usually required) participation of their spouse. Under § 1101(a)(15)(U), an alien who has "suffered substantial physical or mental abuses as a result of having been a victim of criminal activity" and is helpful to law enforcement in prosecuting said criminal activity is eligible for a non-immigrant "U Visa." Congress enacted waivers to exempt VAWA beneficiaries from virtually all inadmissibility grounds, and there is no evidence that Congress intended to exempt aliens subject to reinstatement of a prior order of removal from VAWA. See § 813(b) of the Violence Against Women and Dep't of J. Reauthorization Act of 2005, Pub. L. No. 109-162, 119 Stat. 2960 (Jan. 5, 2006) ("Discretion to Consent to an Alien's Reapplication for Admission.-(1) In General.-The [DHS] shall continue to have discretion to consent to an alien's reapplication for admission after a previous order of removal, deportation, or exclusion. " (emphasis added) ).

Reopening a prior removal order involves challenging the basis for removal. A collateral attack of a reinstatement order typically challenges the administrative process and constitutionality of the reinstatement. Every Circuit Court of Appeals has held that it has jurisdiction over petitions for review of reinstatement orders. Arevalo v. Ashcroft , 344 F.3d 1, 9 (1st Cir. 2003) ; Garcia-Villeda v. Mukasey , 531 F.3d 141, 144 (2d Cir. 2008) ; Avila-Macias v. Ashcroft , 328 F.3d 108, 110 (3d Cir. 2003) ; Velasquez-Gabriel v. Crocetti , 263 F.3d 102, 105 (4th Cir. 2001) ; Ojeda-Terrazas v. Ashcroft , 290 F.3d 292, 295 (5th Cir. 2002) ;Warner v. Ashcroft , 381 F.3d 534, 536 (6th Cir. 2004) ; Gomez-Chavez v. INS , 308 F.3d 796, 800 (7th Cir. 2002) ; Briones-Sanchez v. Heinauer , 319 F.3d 324, 326 (8th Cir. 2003) ; Chay Ixcot v. Holder , 646 F.3d 1202, 1206 (9th Cir. 2011) ; Duran-Hernandez v. Ashcroft , 348 F.3d 1158, 1162 n.3 (10th Cir. 2003) ; Sarmiento Cisneros v. U.S. Atty. Gen. , 381 F.3d 1277, 1278 (11th Cir. 2004).

United States v. Boutin , 269 F.Supp.3d 24, 28 (E.D.N.Y. 2017) ("Both [DHS] and the [DOJ] are part of the same Executive Branch of the federal government. The instant case ... reflects a failure of coordination between the two agencies that jeopardizes the ability of DOJ to protect the interests of the government and of the people of the United States in prosecuting federal crimes."); United States v. Brown , Case No. 4-15-cr-102, 2017 WL 3310689, at *6 (D.N.D. July 31, 2017) ("[D]oes the Government really expect this court to believe that ... [DHS] would simply thumb its nose at Justice and remove the defendant?"); United States v. Tapia , 924 F.Supp.2d 1093, 1098 (D.S.D. 2013) ("[T]his is a situation where one arm of the Executive, wishing to prosecute this defendant criminally, is arguing that he is likely to flee based on the possible actions of a different arm of the same Executive."); Barrera-Omana , 638 F.Supp.2d at 1111-12 ("The problem here is not that defendant will absent himself from the jurisdiction, but that two Article II agencies will not coordinate their respective efforts .... It is not appropriate for an Article III judge to resolve Executive Branch turf battles .... This Court ought not run interference for the prosecuting arm of the government."); United States v. Marinez-Patino , No. 1 CR 064, 2011 WL 902466, at *8 (N.D. Ill. Mar. 14, 2011) ("We reject the proposition that if the defendant were released on bond, ICE would act in a way that can only be described as irrational. We likewise reject the government's argument that Congress has statutorily mandated such an irrational result."); Rembao-Renteria , 2007 WL 2908137, at *2 ("The government argues that this Court must detain [the defendant] or the government will be compelled to deport her, thereby depriving the government of the opportunity to prosecute her. The Court does not construe the relevant law to mandate that this Court, in effect, save the government from itself in this way.").

See United States v. Rodriguez-Lozano , 4:17-cr-00208-RP-HCA-1 at Doc. No. 58 (S.D. Iowa July 20, 2018) (defendant ordered released on conditions despite ICE detainer); United States v. Urizar Lopez , 3:18-cr-00059-JAJ-SBJ at Doc. No. 16 (S.D. Iowa June 9, 2018) (same) and Doc. No. 30 (S.D. Iowa July 18, 2018) (same); United States v. Garcia Munoz , 3:18-cr-00062-JAJ-SBJ-1 at Doc. No. 17 (S.D. Iowa June 19, 2018) (same). Motions to dismiss indictment are pending in Urizar Lopez and Garcia Munoz.

In United States v. Cibrian-Lopez , 5:18-cr-04002-MWB-1, the defendant was ordered released pretrial despite an ICE detainer. Doc. No. 14. However, her pretrial release was revoked when it became apparent she sought deportation in order to avoid prosecution on her pending charges for possession with intent to distribute marijuana and carrying a firearm in furtherance of a drug trafficking crime. Doc. No. 52. There is no evidence that similar motives are behind Villatoro-Ventura's actions here. On the contrary, it appears he seeks to challenge the basis for reinstating the prior removal order - a process that may be easier if he sees the criminal charges against him to his conclusion.

See Santos-Flores , 794 F.3d 1088 ; Ailon-Ailon , 875 F.3d 1334. Further, the District of Columbia Court of Appeals held in United States v. Xulam , 84 F.3d 441 (D.C. Cir. 1996) that a defendant's potential deportation did not establish that he was a risk of voluntary flight, although that case did not involve an ICE detainer or reinstatement of a prior removal order. Finally, the Second Circuit Court of Appeals is presently entertaining a detention appeal on this issue in United States v. Ventura , No. 17-3904. The appeal was set for oral argument on August 21, 2018.

In its brief appealing Judge Mahoney's release order, the Government states: "[T]he magistrate relies on a United States District Court opinion from the District of Utah that found that defendant's non-volitional removal from the country does not render the defendant a flight risk. United States v. Lizardi-Maldonado , 275 F.Supp.3d 1284, 1300 (D. Utah 2017). The United States has not found any appellate court decision that so holds." Doc. No. 27 at 7. This representation is surprising, as the two circuit courts of appeal cases cited above both held that the risk of nonappearance referenced in the BRA "must involve an element of volition." Santos-Flores , 794 F.3d at 1091 ("[T]he risk of nonappearance referenced in 18 U.S.C. § 3142 must involve an element of volition."); Ailon-Ailon , 875 F.3d at 1337 ("We agree with the latter set of courts that a risk of involuntary removal does not establish a 'serious risk that [the defendant] will flee' upon which pre-trial detention may be based."). Judge Mahoney filed her supplemental opinion highlighting both Santos and Ailon-Ailon - as well as a substantial number of district court cases within and outside of the Eighth Circuit - 17 days before the Government appealed her release order.

United States Sentencing Commission, Quick Facts, Illegal Reentry Offenses (June 2018), https://www.ussc.gov/research/quick-facts/illegal-reentry. Although the case before me addresses a defendant who has been charged with illegal re-entry, I suspect that similar arguments about the propriety of allowing immigration detainers or re-instatement of prior removal orders to control the BRA decision could be made about the remaining 19% of immigration offenders.

At least one circuit has held that a categorical ban on pretrial release for illegal aliens (in state court) violates the Eighth Amendment, among other constitutional provisions. Lopez-Valenzuela v. Arpaio , 770 F.3d 772 (9th Cir. 2014). A per se rule mandating pretrial detention in the presence of an ICE detainer would tread similar ground to the state law at issue in Lopez-Valenzuela.

The Government argues that Villatoro-Ventura is asking me to apply the BRA to immigration proceedings, thereby claiming an exemption from detention and removal while this case is pending and receiving an "immigration benefit" under the INA or a get-out-of-jail free card in his criminal case. With all respect, this argument is lame. I do not have the authority to prevent ICE from deporting Villatoro-Ventura within the framework of the present proceedings. My order releasing Villatoro-Ventura under the BRA will merely shift the risk of his deportation while this criminal case is proceeding onto the branch of our federal government that causes it - the Executive Branch. Indeed, it was the Government , not Villatoro-Ventura, that decided to initiate criminal process. The Government has not offered any explanation as to why the USAO and ICE cannot cooperate to protect all parties' mutual interest in seeing this case through to its end. Referring to ICE's forcible removal of Villatoro-Ventura from the country as a "get-out-of-jail free card" as to his criminal charges ignores the fact that it would be the Executive Branch, not the Judicial Branch, that prevents his criminal prosecution if he is removed from the country before he can be tried. The Government's handwringing over "losing" a defendant is therefore thoroughly unconvincing.

Although the calculation would change if either of Villatoro-Ventura's prior convictions were determined to be an aggravated felony, as it stands he has a base offense level of 8 (assuming acceptance of responsibility) with a criminal history category of I. See U.S.S.G. § 2L1.2(a). Counsel for Villatoro-Ventura has indicated he intends to challenge any allegation that Villatoro-Ventura's prior convictions are aggravated felonies.

I make the same finding as to the rest of the new evidence the Government presented during the August 27 hearing, which includes an expired driver's license found in Villatoro-Ventura's possession that may (or may not) have been intentionally altered. Doc. No. 60-3 at 1.

I have no doubt that if Villatoro-Ventura had no family ties in the area, the Government would argue that the lack of such ties supports detention. This "heads I win, tails you lose" posturing is not persuasive.

During the August 27 hearing, defense counsel confirmed that this is how he believes § 3142(d) should be interpreted, but pointed out that the requested remedy would be different if a state government, rather than an Executive Branch agency, took the federal defendant into custody. Frankly, it is unclear what remedy might be available in such a situation if § 3142(d) is interpreted in accordance with the Trujillo-Alvarez reasoning. However, it is not the lack of an obvious remedy but the lack of statutory support for the Trujillo-Alvarez reasoning that is fatal to Villatoro-Ventura's motion.